**STUART PARK ASSOCIATES LIMITED PARTNERSHIP and Stuart Park/Summit Partners, Plaintiffs–Appellants,**

v.

**AMERITECH PENSION TRUST, Defendant–Appellee.**

No. 94–2641.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1994.

Decided April 3, 1995.

Ira J. Bornstein, Harvey J. Barnett, John A. Fritchey, IV, Barnett, Bornstein & Blazer, Chicago, IL, Leonard L. Gordon, Benjamin S. Boyd, Lewis A. Noonberg, David H. Bamberger (argued), Piper & Marbury, Washington, DC, for plaintiffs-appellants.

Alfred W. Whittaker, Kirkland & Ellis, Washington, DC, Frank Cicero, Jr. (argued), Anni Najem, Kirkland & Ellis, Chicago, IL, for defendant-appellee.

Before COFFIN,* CUDAHY and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

This case involves an appeal from a jury's determination that two partnerships formed

---

* The Honorable Frank M. Coffin, Circuit Judge for the First Circuit Court of Appeals, is sitting by designation.

for the purpose of developing a parcel of land are not entitled to recover funding from potential investors who ultimately refused to advance funds due to legal concerns. Stuart Park Associates Limited Partnership and Stuart Park/Summit Partners, the partnerships behind a real estate venture known as "Stuart Park," attempt to impugn the jury's verdict on appeal. They assert that they were in fact entitled to recover under an Investment Agreement that they entered with Ameritech Pension Trust. They allege numerous errors about matters at trial, including complaints about jury instructions, about the district court's comments before the jury and about various evidentiary rulings. Because we approve of the manner in which the district court handled matters at trial, we affirm.

## I.

Stuart Park Limited Partnership and Stuart Park/Summit Partners (collectively, Summit) were formed for the purpose of developing a parcel of land in Arlington, Virginia. Summit planned to develop this land and build a high rise apartment complex to be called "Stuart Park." As part of the plans for Stuart Park, Summit sought to interest various investors in the project.

One of those investors was Ameritech Pension Trust (Ameritech). During the Fall of 1989, Summit began discussions with L & G Realty Advisors (L & G), one of Ameritech's investment advisors. By May 1990, Summit had made little progress in committing potential investors to funding for Stuart Park. Ameritech, for instance, had not responded to Summit's numerous entreaties. Summit's primary problem at Ameritech was attracting the interest of Ameritech's Director of Real Estate Investments, Lloyd B. Thompson, III (Thompson). Repeated efforts to interest Thompson in Stuart Park met with failure; Summit could not even succeed in getting Thompson to examine or discuss the project.

Finally, Summit contacted Donald Bennett (Bennett), one of Thompson's long-time real estate associates. Summit discussed Stuart Park with Bennett and suggested that he might be of assistance in securing Thompson's attention. Summit soon agreed to hire Bennett as a "broker" for Stuart Park. Summit and Bennett decided upon the one-time fee of $350,000.00. The parties dispute Bennett's precise duties under this arrangement. It is clear, however, that one of Bennett's obligations was to interest Thompson in Stuart Park. Bennett was soon successful in creating this interest.

At a meeting of Ameritech's Asset Management Committee, Thompson recommended that Ameritech invest more than $32 million dollars in Stuart Park. Ameritech acted upon his advice. In June 1990, Ameritech's Asset Management Committee approved the proposed investment. Negotiations for the funding began, and in September 1990, Summit and L & G (on behalf of Ameritech) signed an Investment Agreement. This Investment Agreement, among other things, obligated Ameritech to provide over $32 million in funds for Stuart Park.

Just prior to the signing of the Investment Agreement, Ameritech began conducting an internal investigation of alleged improprieties in an unrelated matter. In this regard, Ameritech hired attorney Howard Pearl, a former Assistant United States Attorney specializing in financial fraud. Pearl began conducting an internal investigation. While carrying on the investigation, he uncovered invoices that raised questions about Thompson's conduct. When he learned that Thompson planned to leave Ameritech at the end of September, Pearl shifted the focus of his investigation to Thompson.

Pearl first interviewed Thompson on September 25, 1990, a few days before Thompson's scheduled departure. Later that night, a security guard caught Thompson attempting to remove documents from his office. The security guard confiscated the documents, which revealed the particulars of the Bennett–Thompson relationship as it concerned a number of Ameritech's past investments. A note on one of the documents stated "Stuart Pk—*$350 when close deal*." R.App. 425.

In November 1990, Ameritech assembled a group of outside counsel to discuss the findings of Pearl's investigation and to analyze Ameritech's legal obligations as a pension

trust. The group concluded that a kickback scheme existed between Thompson and Bennett, that the scheme violated federal law and that federal law prevented Ameritech from proceeding under its contract with Summit. On November 19, 1990, Ameritech accordingly notified Summit that it could not go forward with funding for Stuart Park.

The parties attempted negotiations. Summit took the position that any kickback scheme was Ameritech's problem and none of Summit's concern. When Ameritech steadfastly continued to refuse funding, Summit brought suit to recover under the Investment Agreement.

Summit originally asserted various claims, including claims for breach of contract and promissory estoppel. On a motion for summary judgment, the district court dismissed some of these claims, but ruled that the remainder of them needed to be submitted to the jury. In particular, the district court held that the jury should examine Ameritech's *in pari delicto* defense, in which Ameritech claimed that the Investment Agreement should not be enforced due to Summit's awareness of the illegality, because it presented a factual dispute. The court also found issues surrounding the promissory estoppel claim, particular elements of damage and the alleged failure of a condition precedent appropriate for jury submission. The court further ruled that Ameritech's suggestion that the contract was illegal was without merit because Ameritech's own agent, Thompson, had participated in the illegal circumstances of which it complained. Summary judgment was therefore granted in part and denied in part.

The parties went to trial. Once there, Ameritech presented the *in pari delicto* defense, as well as defenses based on breach of warranty and the failure to satisfy a condition precedent. The jury returned a general verdict in Ameritech's favor, finding that nonperformance of the Investment Agreement was justified. Summit appeals, making various complaints about the district court's choice of jury instructions, its statements to the jury and certain of its evidentiary rulings.

## II.

■ Summit's first complaints on appeal concern the district court's dealings with the jury. First, Summit suggests that the district court erred in instructing the jury about the doctrine of *in pari delicto;* the instruction used purportedly permitted the jury to deny relief if it found that Summit was recklessly indifferent to Thompson's wrongdoing. A proper instruction, claims Summit, would have focused on the parties' relative fault in the complained-of transaction. Second, Summit suggests that the district court improperly characterized the Investment Agreement as a "prohibited transaction." Summit asserts that such a characterization unfairly prejudiced it in the eyes of the jury.

The district court made the following statements to the jury:

> The Court has previously ruled that Donald Bennett and Lloyd Thompson participated in a fee-splitting or kickback scheme in relation to the Stuart Park project.

> The Court has previously ruled that the kickback scheme between Donald Bennett and Lloyd Thompson means that the transaction was a prohibited transaction that violated ERISA.

> If you find that the defendant has proved that the plaintiffs' management knew or was recklessly indifferent to the wrongdoing of Bennett and Thompson prior to November 19, 1990, then you must find for the defendant.

> And as to that, you can rely on any evidence that was presented to you, regardless of when it relates to, but what you would have to find is that the state of mind, meeting that standard in the instruction, existed prior to November 19, 1990.

R.App. 229. Despite Summit's complaints, we do not find these statements objectionable in the context of the present case. The focus of the parties' argument at trial renders any error in the submitted instruction harmless. Additionally, we do not believe that by using the term "prohibited transaction" the trial court prejudiced Summit's case. We therefore affirm.

## A. *The In Pari Delicto Problem*

■ The crafting of jury instructions is largely a matter within the district court's discretion. *Heller Int'l Corp. v. Sharp,* 974 F.2d 850, 860 (7th Cir.1992). Appellate review of jury instructions is therefore circumscribed. A reviewing court will examine the instructions given to determine whether, as a whole, they were likely to have substantially impaired the jury's ability to understand the case. *Needham v. White Laboratories, Inc.,* 847 F.2d 355, 358 (7th Cir.1988). This analysis examines an isolated clause in context to determine whether, despite inaccuracy or ambiguity, the complaining party suffered any prejudice as a result of the error. *Binks Mfg. Co. v. Nat. Presto Industries, Inc.,* 709 F.2d 1109, 1117 (7th Cir.1983).

■ Summit essentially makes three complaints about the instruction the district court gave concerning *in pari delicto.* First, it suggests that using a "recklessly indifferent" standard was prejudicial because it suggested to the jury that Summit had actual knowledge of the kickback. Second, it claims that the district court erroneously omitted reference to Ameritech's culpability in light of the fact that the doctrine of *in pari delicto* considers comparative fault. Finally, Summit asserts that the jury was erroneously instructed that it could consider evidence of Summit's state of mind prior to November 19, 1990, the date that Ameritech refused to extend funding for Stuart Park. We do not consider any of these alleged errors sufficient to demonstrate a level of prejudice meriting reversal.

The district court's instruction on *in pari delicto* allowed the jury to return a verdict for Ameritech if it found that Summit either "knew or was recklessly indifferent" to the Bennett–Thompson wrongdoing. This instruction does depart from the more standard statement of the doctrine. *See generally, Corbett v. Devon Bank,* 12 Ill.App.3d 559, 299 N.E.2d 521, 530 (1973) (noting equal fault); *O'Hara v. Ahlgren, Blumenfeld & Kempster,* 127 Ill.2d 333, 130 Ill.Dec. 401, 408, 537 N.E.2d 730, 737 (1989) (focusing on equal fault). It does not do so in a way that prejudiced Summit, however.

Contrary to Summit's assertion on appeal, the instruction given did not suggest that Summit had knowledge of Bennett's and Thompson's wrongdoing. Summit claims that the court's use of the word "indifferent" implied that Summit knew of the scheme. We fail to see how this language suggests knowledge. One can be indifferent to something without knowing about it—for instance, when one is indifferent to *knowing or finding out* about it. The jury instruction specifically asks the jury to find whether Summit had knowledge of the wrongdoing. It is therefore difficult to understand precisely how such an instruction might have implied that Summit in fact had knowledge. It was clear under the instruction given that knowledge and reckless indifference were alternatives—either of which would be sufficient to preclude a judgment for Summit. No discernible prejudice resulted from this phraseology.

■ Neither do we find the instruction substantively wanting under the facts of this case. Summit complains because the doctrine of *in pari delicto* ordinarily requires a comparison of fault between the parties. The instruction given, on the other hand, focused only upon the possibility of Summit's wrongdoing, without examining Ameritech's conduct. We fail to see how this focus prejudiced Summit. Effectively, the instruction given established—as a matter of law—that Ameritech *had* either known of or been recklessly indifferent to the existence of the scheme. This was the precise issue that the instruction removed from the jury's consideration. If anything, such an instruction favored Summit—leaving open the possibility that it was not in fact aware of wrongdoing, while definitively establishing Ameritech's awareness. It is within a trial judge's discretion to focus the jury's attention on the issues to be determined. *See General Leaseways v. Nat'l Truck Leasing Ass'n,* 830 F.2d 716, 727 (7th Cir.1987).

The case was in fact submitted to the jury in this form because of Summit's litigation posture. It argued that Ameritech could not try the issue of its own knowledge and conduct because of the district court's earlier ruling that Thompson's conduct would be

imputed to Ameritech. The district court apparently accepted this argument. At Summit's insistence, therefore, the primary issue before the district court was the legitimacy of its own conduct. Summit's complaints about a departure from more traditional *in pari delicto* instructions therefore lack merit.[1]

■ Neither did the district court's timing instruction prejudice Summit. The district court told the jury that evidence, "regardless of when it relates to," could be used to determine whether Summit knew about or was recklessly indifferent to the scheme. Summit now suggests that this allowed the jury to use Summit's after-the-fact nonchalance about Ameritech's internal problems as a basis for liability. The district court specifically stated in its instructions, however, that "you would have to find ... that the state of mind, meeting that standard in the instruction, existed prior to November 19, 1990." These instructions clearly directed the jury to the relevant time for which they needed to examine Summit's knowledge. Because we use common sense to consider the instructions given as a whole, *see Heller*, 974 F.2d at 856, we find that this instruction correctly directed the jury to the relevant time period for Summit's awareness.

The district court's chosen instructions sufficiently apprised the jury of the fact-finding tasks to which it needed to devote its attention in the jury room. Having previously concluded that Thompson's misconduct should be imputed to Ameritech, the district court focused the jury's attention on Summit's awareness of the illegal activity. Although these instructions departed from the "comparative" standard ordinarily established for an *in pari delicto* defense, such a departure was within the trial court's discretion. The instructions applied the *in pari delicto* standard in practical effect—ultimately determining whether Summit was *as culpable* as Ameritech. In no way did the instructions suggest that Summit already possessed knowledge of the wrongdoing. And in no way did they advise the jury that it might premise liability on a state of mind existing at some time other than that of the illegal activity. Under these circumstances, Summit's complaints do not merit reversal.

### B. The Comment on the Illegality of the Transaction

■ Summit also complains of a comment that the district court made to the jury concerning the legality of the Investment Agreement. Specifically, the court stated that "the kickback scheme between Donald Bennett and Lloyd Thompson means that the transaction was a prohibited transaction that violated ERISA." *See generally* Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 (1985) (ERISA). This statement reflects the court's earlier ruling on the motion for summary judgment, where it determined that the undisputed evidence demonstrated the existence of a "fee-splitting scheme" in relation to Stuart Park. Mem. Op. at 7–8. The district court believed that this scheme violated federal law because Thompson accepted personal monetary benefit despite various legal obligations to act solely in the interest of the Pension Trust's participants and beneficiaries. *Id.* The court declined to hold that this illegality rendered the Agreement unenforceable, however, because it imputed Thompson's behavior to Ameritech (and a party cannot invoke the defense of impossibility when its own actions rendered the contract illegal). *Id.* at 9.

Summit now complains of the court's later comment about this illegality. It claims that the Investment Agreement was not, in fact, illegal, despite Thompson's and Bennett's antics. It further claims that whatever the content of ERISA's provisions, those provisions should not be applied to enable a pension trust to avoid its contractual obligations to third parties. In response, Ameritech suggests that the district court ought to have held the Investment Agreement invalid as a matter of law.

■ Arguments about the Investment Agreement's validity must be read in the

---

1. Any concerns that we might have that the instruction allowed the jury to completely disregard Ameritech's conduct are alleviated by the fact that Summit's counsel focused on Ameritech's knowledge and conduct (by virtue of its association with Thompson) during closing argument. *See Smith v. Chesapeake & Ohio Ry. Co.,* 778 F.2d 384, 389 (7th Cir.1985) (in assessing instructions, a court may look to opening statements, evidence and closing arguments as well).

context in which they arose. Summit is essentially complaining about a comment that the district court made to the jury. It is well-established as within a trial judge's discretion to comment upon the evidence for the jury's benefit. *General Leaseways*, 830 F.2d at 727. *See also* 9A C. Wright & A. Miller, *Federal Practice & Procedure* § 2557 (1995). Here, the district court did just that. Because we believe the district court's characterization did not rest on an erroneous understanding of the applicable law, we find that Summit suffered no prejudice as a result of this remark.[2]

The district judge correctly recognized that the arrangement between Bennett and Thompson violated ERISA's provisions and undermined its goals. ERISA was originally enacted as a comprehensive system of protections for the pensions and welfare benefits of employees and their beneficiaries. *Anweiler v. American Elec. Power Service Corp.*, 3 F.3d 986, 989–90 (7th Cir.1993). Consequently, a number of ERISA's provisions are directed toward monitoring the decisions made by plan managers and fiduciaries. Because the "crucible of congressional concern was the misuse and mismanagement of plan assets," specific statutory provisions address a fiduciary's self-dealing. *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir.1987) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 141 n. 8, 105 S.Ct. 3085, 3089 n. 8, 87 L.Ed.2d 96 (1985)). In particular, ERISA's Section 406(b) specifies that:

> A fiduciary with respect to a plan shall not—(1) deal with the assets of the plan in his own interest or for his own account, ... or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

It is readily apparent that Thompson violated this provision by exchanging favorable recommendations for personal monetary gain. Here, he accepted a percentage of the money that Bennett received from Summit in connection with Stuart Park. He then made a recommendation that Ameritech invest over thirty-two million dollars in Stuart Park. Under these circumstances, it is clear that he did not act exclusively in the interest of Ameritech's participants and beneficiaries—as ERISA required him to do. *See* 29 U.S.C. §§ 1104(a)(1)(A)(i), 1106(b). *See also Lowen*, 829 F.2d at 1214 (holding that an ERISA fiduciary violates section 1106 by receiving money from a company because of the company's dealings with the pension fund). Summit apparently does not dispute this conclusion. Instead, it reiterates on appeal the same argument that it made to the jury—that it should not be held accountable for the wrongdoing of Bennett and Thompson.

Summit's argument depends entirely on its belief that the Investment Agreement ought to be considered unrelated to the Bennett–Thompson fee-sharing arrangement. It suggests that the fact that the behavior of Bennett and Thompson may have been prohibited by ERISA provides no basis for the conclusion that the Investment Agreement is itself invalid. This argument, however, runs counter to ordinary principles of causation. If Summit disbursed money to Bennett with the intent that he influence Thompson, the Investment Agreement was in no sense "independent" of the bribery that in fact occurred. This remains true even if we assume that Summit had *no knowledge* that Bennett intended to give Thompson a kickback. The exchange of funds prompted or induced Thompson to recommend the Investment Agreement as a viable investment. Ameritech eventually acted upon this suggestion.

As such, the Investment Agreement cannot be characterized as an "intelligible economic transaction in itself." *See, e.g., Kelly*

---

2. We decline to rule, as Ameritech urges us to, that the Investment Agreement was unenforceable as a matter of law. The trial court did not reach this issue because it determined that Ameritech should not be entitled to benefit from wrongdoing occasioned by the conduct of its own agent. We will not reach the issue because we do not wish to examine the nature of Thompson's relationship with Ameritech in the absence of development in the record. In any event, this issue is collateral to the primary problem that we address here, which is whether the Investment Agreement could properly be characterized as "prohibited."

v. *Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); *Cement Masons' Pension Fund v. Dukane Precast*, 822 F.Supp. 1316, 1321 (N.D.Ill.1993); *Donovan v. Schmoutey*, 592 F.Supp. 1361, 1400 (D.Nev. 1984). The receipt of funds necessarily entered into Thompson's calculus concerning Stuart Park's viability as an investment; therefore, we are not confronted with a truly independent economic decision. In light of these factors, it is illogical to claim that the Investment Agreement should be examined in a void, completely ignoring the questionable circumstances under which it was entered.

These circumstances convince us that the trial court's comment was not improper. Fulfilling the contract would have given effect to Thompson's illegal behavior. Avoiding the contract, on the other hand, promises to minimize the damage flowing from that conduct. One of the policies behind ERISA is that of protecting the interests of plan members and beneficiaries. *Lowen*, 829 F.2d at 1213. It was not error to recognize the existence of this interest in comments made to the jury. In general, a court has the power to refuse to enforce a contract when enforcement would violate clearly articulated congressional goals and policies. *See United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563–64, 81 S.Ct. 294, 315–17, 5 L.Ed.2d 268, *reh'g denied*, 365 U.S. 855, 81 S.Ct. 798, 5 L.Ed.2d 820 (1961); *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 79, 102 S.Ct. 851, 857, 70 L.Ed.2d 833 (1982).

In *Mississippi Valley*, the Supreme Court refused to enforce a contract induced by actions involving a conflict of interest under federal law. 364 U.S. at 562, 81 S.Ct. at 315. There, a Wall Street executive had advised the federal government and acted on its behalf in negotiations ultimately resulting in a contract between the federal government and the Mississippi Valley Generating Company. *Id.* at 523, 81 S.Ct. at 295. The Court found the contract unenforceable because it was "tainted by a conflict of interest on the part of a government agent"—a matter that undermined the goals of the federal statute prohibiting conflicts. *Id.* at 563, 81 S.Ct. at

315. *See also Kaiser Steel*, 455 U.S. at 78–79, 102 S.Ct. at 856–57 (holding that, if a contract to contribute to union funds arose from an obligation that was illegal under the antitrust or labor laws, enforcing that contract would command unlawful conduct).

■ The present case is virtually indistinguishable. Conduct that rather clearly violated the spirit and express provisions of ERISA prompted the formation of the Investment Agreement. Honoring that Agreement would only legitimate and reward the conduct. Under these circumstances, it is not unreasonable to conclude that illegality in the contract's formation resulted in a "prohibited transaction." Because enforcement would so offend ERISA's various prohibitions on self-dealing, it is not material that ERISA does not specifically provide this remedy. *See Mississippi Valley*, 364 U.S. at 563, 81 S.Ct. at 315 (noting that statutory silence is not dispositive when a contract "arises out of circumstances that would lead enforcement to offend the essential purpose of the enactment").

Any doubts we have about adopting the defense of illegality here are resolved upon an examination of the benefits and burdens attendant to refusing to enforce contracts like this one. *See, e.g., Northern Indiana Public Service Co. v. Carbon County Coal*, 799 F.2d 265, 273 (7th Cir.1986) (discussing the balancing of interests necessary to application of the federal defense of illegality). As stated, ERISA's goals would be undermined by the enforcement of this type of transaction. Summit has pointed to no policy interests to the contrary. Despite Summit's protestations on this subject, our decision will hardly deter investors from monitoring trustees (an activity toward which investors already have a substantial incentive). Nor do we believe that it will result in less market stability; decisions refusing to give effect to bribery *increase* confidence in market processes.

In short, Summit cannot attempt to distance itself from Bennett's illegal behavior and yet at the same time benefit from the fruits of that behavior.[3] Whether or not

---

**3.** We also seriously doubt that the clauses of the

Investment Agreement (such as Ameritech's war-

Summit was aware of the precise parameters of Bennett's deal with Thompson, Summit's commission payment enabled Bennett to exercise influence over Thompson's judgment, essentially subsidizing the eventual violation of ERISA. In light of these factors, the district court's characterization of the Investment Agreement as a "prohibited transaction" was not error.

### III.

█ Summit also launches a number of evidentiary complaints about expert testimony, opinion testimony, the admission of numerous exhibits and the like. Of course, the district judge is ordinarily the arbiter of evidentiary matters. We will not disturb the district court's rulings on appeal absent a clear abuse of discretion. *Stutzman v. CRST, Inc.*, 997 F.2d 291, 299 (7th Cir.1993).[4] Summit nevertheless makes various objections which we will address in turn.

#### A. *The Expert Testimony of David Walker*

█ Summit first complains of the district court's decision to allow David Walker to testify as an expert. Walker is a former government official familiar with ERISA who is now working as a paid consultant (specifically, as the managing director of Arthur Andersen's compensation and benefits practice). At trial, he apparently testified concerning Ameritech's motives for refusing to commit funding to Stuart Park. Much of this testimony concerned a fiduciary's obligations under ERISA. Summit now sug-

gests that this testimony was both irrelevant and misleading.

These contentions are without merit. Summit's numerous allegations at trial called Ameritech's motives for refusing to fund Stuart Park into question. This strategy forced Ameritech to provide reasons for its refusal. As part of the explanation it provided to the jury, Ameritech was entitled to rely on expert testimony. Specifically, expert testimony concerning fiduciary obligations under ERISA would have established that Ameritech's concerns were reasonable and not invented for the purposes of trial. Expert testimony is admissible if the witness has "specialized knowledge [that] will assist the trier of fact to understand the evidence in the case." *United States v. Briscoe*, 896 F.2d 1476, 1497 (7th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). It is not material that the matter involved here happened to be legal; Ameritech's reasons for refusing to go forward with funding (which Summit called into question) were themselves legal, and Ameritech could reasonably present them before the jury.

#### B. *The Fact Testimony of Howard Pearl*

█ Summit also complains about the admission of Howard Pearl's testimony. Pearl, an attorney, conducted the internal investigation that led to the discovery of Thompson's misdeeds. At trial, he apparently testified to matters concerning Ameritech's discovery and knowledge of the Bennett–Thompson relationship, which he characterized as a "kickback scheme." Summit complains because it

ranty concerning compliance with ERISA) were intended to allocate the risks related to precontractual conduct. Summit directs our attention to Ameritech's contractual promise to comply with ERISA's provisions. But this promise was contained in the Investment Agreement. We therefore fail to understand how it could be interpreted to eradicate precontractual fouls. Put simply, the clause itself is one *result* of the problematic behavior; we therefore find unpersuasive Summit's argument that the clause should now be interpreted to protect it against that behavior. In any event, the existence of the clause does not alter our conclusion that the Investment Agreement is itself suspect under the principles we have discussed.

4. Summit suggests that a modification of this standard is in order in light of the fact that judges other than the trial judge handled pretrial evidentiary rulings. A trial judge's discretion in evidentiary matters is, however, premised on her peculiar relationship to the evidence. She ordinarily has access to and familiarity with the complete record. She has the opportunity to conduct hearings and listen to arguments on single issues. These considerations (among others) are not compromised merely because different district judges preside over the same case. The district judges still retain a point of view impossible to achieve on appeal. We therefore adhere to the deferential standard of review of evidentiary matters ordinarily exercised on appeal.

believes these matters to be both irrelevant and cumulative given the court's previous undisputed finding that a fee-splitting scheme existed.

This argument assumes that the sole purpose for which this testimony would be offered is as evidence of the kickback scheme itself. Pearl's investigation and findings, however, were material to a broader range of matters. For instance, they too tended to explain why Ameritech believed it could not proceed with financing. They also tended to negate the inference that Ameritech might have prevented some of the harm had it been more vigilant about Thompson's behavior. In short, they explained both why and how Ameritech discovered the bribery. The district judge correctly avoided the "crabbed notions of relevance" upon which Summit seems to insist. *See Riordan v. Kempiners*, 831 F.2d 690, 691 (7th Cir.1987). It was well within the district court's discretion to admit Pearl's testimony.

 Summit also complains of the admission of ten different documents in connection with Pearl's testimony. In this regard, it makes the conclusory allegations that the documents were "irrelevant and unauthenticated," and that they contained "extensive hearsay." To the extent that these documents referenced Pearl's investigation, they are relevant for the reasons we have given. As to any hearsay or authentication objections, we note that Summit's complaints on appeal are not sufficiently particularized to enable us to rule on the matter. Summit has done little more than provide a list of the various documents of which it complains. We do not know whether these documents constitute hearsay because Summit has not demonstrated the precise purpose for which each was offered. Neither has Summit indicated its *specific* objections in the trial court to the admission of the documents. Finally, Summit cites no authority indicating that the admission of any of the documents was clear error. Under these circumstances, Summit has waived consideration of the issue for

appeal. *Holzman v. Jaymar–Ruby, Inc.*, 916 F.2d 1298, 1303 (7th Cir.1990); *Varhol v. National R.R. Passenger Corp.*, 909 F.2d 1557, 1566 (7th Cir.1990).[5]

### C. *Evidence of the Value of an Equity Interest*

 Summit also complains because the district court excluded evidence that it proffered detailing the value of its "equity interest" in Stuart Park. The district court excluded this evidence because it had earlier ruled that Summit was not entitled to recover lost profits in light of its status as a new and unproven venture.

We do not believe that this ruling was error. Under Illinois law, a new business generally has no right to recover lost profits. This element of damages is recoverable only if the business was previously established. *See, e.g., Hill v. Brown*, 166 Ill.App.3d 867, 117 Ill.Dec. 687, 692, 520 N.E.2d 1038, 1043 (1988). The apartment complex was to be built on a barren piece of undeveloped land. No evidence demonstrated what, if anything, this particular venture would yield. Summit argues vehemently that its successes with other apartment buildings should be considered as probative of this essential fact. However, these are different pieces of real estate from different markets—not providing a self-evident basis for generalization. *See, e.g., Coastland Corp. v. Third Nat'l Mortg. Co.*, 611 F.2d 969, 978 (4th Cir.1979). We do not believe the trial court's decision to exclude this evidence constitutes error.

### IV.

The jury returned a verdict in favor of Ameritech. On appeal, Summit has not demonstrated error meriting reversal. Accordingly, the district court's judgment is

AFFIRMED.

---

5. Even assuming that error could·be proved from the admission of any of these documents, we believe that such error would be harmless. Some of the documents appear to memorialize Pearl's investigation of Thompson—a matter he testified about at trial. As such, the evidence is cumulative and provides no basis for the requisite showing of prejudice. *Stutzman*, 997 F.2d at 298. The remainder of the documents pertain to matters relating to Thompson's affairs—again, nothing that would provide a basis for believing that Summit had been prejudiced.