# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 05-1371

TAS DISTRIBUTING COMPANY,
INCORPORATED,

*Plaintiff-Appellant,*

v.

CUMMINS ENGINE COMPANY,
INCORPORATED,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 C 1026—**Joe Billy McDade**, *Judge.*

_____

ARGUED SEPTEMBER 19, 2006—DECIDED JUNE 14, 2007
_____

Before RIPPLE, MANION and WOOD, *Circuit Judges*.

RIPPLE, *Circuit Judge*. This case arises out of an agreement between TAS Distributing Company, Inc. ("TAS") and Cummins Engine Company, Inc. ("Cummins"). In that agreement, TAS granted Cummins a co-exclusive license to use its idle-control technology for heavy-duty truck engines. The agreements required Cummins to "make all reasonable efforts to market and sell" the licensed products in an effort to maximize royalties payable to TAS. TAS, believing that Cummins was not making "all reasonable

efforts," filed this action in the Central District of Illinois. The complaint set forth twelve counts, including claims for breach of contract and for specific performance. At the close of discovery, Cummins moved for summary judgment, and TAS cross-moved for partial summary judgment (relating specifically to Cummins' failure to market one particular product, the "Temp-A-Stop" Product). The district court granted Cummins' motion for summary judgment and denied in part and granted in part TAS' cross-motion. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A.  Facts

TAS is an Illinois corporation with its principal place of business and corporate headquarters in Peoria, Illinois. It invents, develops, engineers, markets and licenses patented, proprietary technology. This technology automatically turns an engine on under certain circumstances ("Temp-A-Start") and off during other circumstances ("Temp-A-Stop"). Cummins is an Indiana corporation with its principal place of business in Columbus, Indiana. Cummins manufactures engines for use in trucks and has approximately thirty percent of the market share of the United States truck engine market.

### 1.

In order to permit a clear understanding of the litigation before us, we must provide some background pertaining to

the underlying contractual arrangement between the parties.

**a.**

TAS has four technologies relevant to this dispute. Two of these technologies are used to manufacture "Temp-A-Start" Products; they perform functions that automatically turn on an engine. The other two involve "Temp-A-Stop" Products; they function to power down automatically an engine when it is not in use. Each of these products comes in two different varieties—an "ECM" or "One-Box" Product which is installed into the engine itself and a "Retrofit" or "Two-Box" Product which can be added to an existing engine or vehicle.

Before Cummins approached TAS about a licensing agreement, TAS had an exclusive license agreement with Detroit Diesel Company ("DDC"). In TAS' view, DDC had failed to comply with certain aspects of the agreements that were necessary to preserve the exclusive nature of the relationship. TAS therefore brought an action to rescind the TAS/DDC License Agreement; it sought a declaration that the TAS/DDC License Agreement no longer provided exclusive rights to DDC. Shortly thereafter, Cummins approached TAS and told TAS that it desired to obtain the right to use its proprietary technology. Cummins urged TAS to pursue aggressively litigation against DDC in order either to terminate or to eliminate the exclusivity of the TAS/DDC Agreement. In March 1998, the United States District Court for the Central District of Illinois granted summary judgment in TAS' favor, declaring that DDC's exclusive rights under the agreement were validly terminated. TAS and DDC then

entered into settlement negotiations. TAS, rather than pursue any substantial monetary compensation from DDC, negotiated with Cummins to have "co-exclusive" rights to certain aspects of the TAS technology. TAS alleges that it opted for this quick resolution because Cummins consistently had represented that it had a strong commitment to the TAS technology and that it would utilize aggressively the technology in its engines.

### b.

In February 1997, TAS and Cummins entered into a Master Agreement regarding the TAS technology, conditioned upon a judicial determination that the TAS/DDC license was no longer exclusive. The Master Agreement generally governed the relationship between the parties, defined various terms, established non-competitive requirements and protected the TAS technology. The Master Agreement included an integration clause. The two companies also entered into a License Agreement. The License Agreement granted Cummins a license to utilize the TAS technology and set forth royalty and payment terms. The License Agreement also included the following clause:

> Licensee shall make all reasonable efforts to market and sell ECM Products and Retrofit Products so as to maximize the payment of royalties to Licensor under this License Agreement.

R.1, Ex.B at 5.

A "product" is defined as "any product, including any component or subassembly of the product, manufactured with or incorporating all or a substantial part of the Sub-

ject Technology." R.1, Ex.A at 2 (Master Agreement). The License Agreement defined generally the "subject technology" as all technology owned or licensed by TAS relating to Temp-A-Start and Temp-A-Stop. The License Agreement also provided for minimum royalty payments. This minimum royalty schedule required Cummins to make royalty payments totaling at least $1,000,000 over a five-year period. Those minimum royalty payments would continue after the fifth year if "Licensee does not generate sufficient sales to meet the minimum royalty payments." R.1, Ex.B at 4 (License Agreement). Under § 6(b) of the License Agreement, Cummins could elect to terminate its rights to utilize the subject technology and would not be obligated to pay the minimum royalties after the fifth year. The parties additionally entered into a First Amendment to these agreements, which stated that TAS could use and sell the subject technology itself, and that TAS could license and sell it to other major engine manufacturers including DDC, Mack Trucks, Inc. and Caterpillar, Inc.

### c.

Cummins integrated both the Temp-A-Start and the Temp-A-Stop technology into its "ICON Product."[1] It developed a brochure for this product and featured it at trade shows and in product presentations. Despite these efforts, Cummins averaged sales of fewer than 200 ICON Products on an annual basis. Cummins developed and

---

[1] Cummins employees testified that they were not aware of the name "Temp-A-Stop," however this name was proprietary to TAS as stated in the Master Agreement.

sold a "Two-Box" or "Retrofit" Product incorporating both the Temp-A-Start and Temp-A-Stop technology,[2] and similarly developed and sold a "One-Box" or "ECM" Product. Cummins discontinued the "ECM" Product in order to comply with new Environmental Protection Agency requirements in October 2002.

The sales performance of Cummins' products was substantially below the expectations of the parties. Prior to entering into any contracts with TAS and during negotiations, Cummins made certain projections regarding its likely sales of engines incorporating the TAS technology. These projections ranged from likely sales of 4,000 products during the first year, and 10,000 each subsequent year, to the projection that Cummins would eventually attain 12,000 a year. Indeed, Cummins' competitor, DDC, allegedly sold significantly more TAS Products than did Cummins.[3] Nevertheless, Cummins consistently made the minimum royalty payments as required by the License Agreement. It has fulfilled its contractual obligation to pay at least $1,000,000 in royalties.

TAS submitted an affidavit of its president, Harvey Slepian, in support of its motion for partial summary

---

[2] In its opening brief TAS contended that Cummins had failed completely to develop or manufacture any product containing the Temp-A-Stop technology. However, TAS conceded in reply that Cummins' ICON Product incorporated both the Temp-A-Start and Temp-A-Stop technologies. *See* Reply Br. at 5.

[3] Harvey Slepian, the president of TAS, stated in an affidavit that DDC had sold an annual average of 15,000 engines incorporating the TAS technology in each of the past four years. R.20 at 145.

judgment. Slepian's testimony attempted to quantify damages owed to TAS through comparisons to sales of similar products by DDC.[4]

## B. District Court Proceedings

The district court granted Cummins' motion for summary judgment. The district court determined that there were disputed material issues of fact with respect to whether Cummins made "all reasonable efforts" to market and sell the TAS technology. However, it took the view that this determination did not preclude a grant of summary judgment because proof of damages is an element of a breach of contract claim, and TAS had failed to present any proof that it was damaged by Cummins' alleged failure to make "all reasonable efforts" to market TAS' products. TAS had cross-moved for partial summary judgment based upon Cummins' alleged failure to market a stand-alone Temp-A-Stop Product. The district court did not reference expressly the Temp-A-Stop Product when ruling on Cummins' summary judgment motion. TAS submits that, because the district court did not

---

[4] Cummins filed a motion to strike this affidavit, alleging numerous inadequacies. Cummins claimed that the affidavit failed to comply with Federal Rule of Civil Procedure 56(e), which establishes certain minimal requirements for affidavits submitted in support of a motion for summary judgment. Cummins further claimed that, because statements in the affidavit conflicted with Slepian's deposition testimony, offered legal conclusions, and/or were hearsay, the affidavit was improper. The district court, after ruling on the cross-motions for summary judgment, denied this motion to strike as moot.

reference expressly Cummins' failure to manufacture a stand-alone Temp-A-Stop Product, summary judgment was granted improperly in favor of Cummins. In fact, the district court did not reference expressly either product, but rather refers to "TAS technology," "licensed technology," "products" and "units." R.36 at 10, 11, 12.[5] The district court presumably determined that the lack of proof of damages disposed of the dispute regarding both products. Finally, the district court declined to order specific performance of Cummins' obligations under the "all reasonable efforts" clause of the License Agreement. The court held that TAS would have an adequate damages remedy should Cummins violate future obligations under the License Agreement.

## II

## DISCUSSION

We review the district court's grant of summary judgment de novo. *See Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005). In doing so, we must construe all facts

---

[5] In fact, the only place where the district court references expressly one of the TAS products by name occurs in the Amended Agreement between the parties which directly mentions the Temp-A-Start Product. *See* R.16, Ex.D at 1, 2. This agreement references the Temp-A-Start Product eleven times and includes the words "Temp-A-Stop" only three times. Although it is true that the district court did not reference explicitly the Temp-A-Stop Product, the opinion discussed TAS technology at length. Failure to employ the term "Temp-A-Stop," without more, does not warrant reversal of the grant of summary judgment in favor of Cummins.

and make all reasonable inferences in favor of the non-moving party. *Id.* Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as matter of law." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## A.

As we have noted in our earlier description of the district court's ruling, that court determined that there were genuine issues of triable fact with respect to whether Cummins had employed its best efforts in selling engines with TAS' technology. However, the court nevertheless held that summary judgment for Cummins was proper because TAS had failed to produce any evidence that would support an award of damages.

TAS submits, for the first time in its reply brief, that, in a breach of contract case, damages are presumed. We cannot consider this argument; it is well-settled that arguments first made in the reply brief are waived. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1441 (7th Cir. 1992).[6]

---

[6] Even if the issue were not waived, the argument would be without merit. The authorities upon which TAS relies do not support such a proposition. First, TAS relies on *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1372 (7th Cir. 1990). There, the district court had *dismissed* an action for breach of contract; we then held that "failure of proof of

(continued...)

In Illinois, "[i]n order to plead a cause of action for breach of contract, a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages. Only a duty imposed by the terms of a contract can give rise to a breach." *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004); *see also Ollivier v. Alden*, 634 N.E.2d 418, 422 (Ill. App. Ct. 1994) ("As the party seeking to recover, the plaintiff bears the burden of proving that he or she sustained damages. . . ."). Therefore, under Illinois law, it is necessary to show damages—not the specific amount, but rather that the plaintiff did, in fact, suffer some damages. *See Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.*,

---

⁶ (...continued)

damages does not justify dismissal." *Id.* The difference in procedural posture is significant. TAS also relies upon *Hydrite Chemical Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 890 (7th Cir. 1995). A careful reading of that case demonstrates it does not support the view that, in Illinois, an action for breach of contract can be maintained without proof of damages. First, that case applied Wisconsin tort law rather than Illinois contract law. Wisconsin tort law distinguishes between the "fact of injury and the amount of injury. Tort liability requires proof of the first, that is, proof that there was injury, regardless of how much." *Id.* (citing *Stromberger v. 3M Co.*, 990 F.2d 974, 976 (7th Cir. 1993)). However, Illinois law is clear that, to state a claim for breach of contract, one must be able to prove actual damage. *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004); *see also Ollivier v. Alden*, 634 N.E.2d 418, 422 (Ill. App. Ct. 1994).

255 F.3d 397, 401 (7th Cir. 2001).[7] Merely showing that a contract has been breached without demonstrating actual damage does not suffice, under Illinois law, to state a claim for breach of contract. *Id.* ("On TTA's under-standing of what ¶ 4 means, MKC broke its promise; neither MKC nor Amerail (after the delegation in 1995) even once offered TTA an opportunity to meet another subcontractor's bid. *But this does not matter unless TTA can show damages, and the district court held that it could not do so.*") (emphasis added).

Because the district court granted summary judgment to Cummins on the ground that TAS had failed to dem-onstrate that it could prove damages, we pause at this point to set forth the basic principles that govern that issue. TAS essentially is seeking the profits it allegedly had lost because Cummins had breached the "all reason-able efforts" requirement of the parties' agreement. We therefore must focus on the requirements to prove and receive lost profit damages.

As a general principle, when seeking the recovery of lost profits, a claimant must establish these lost profits with "reasonable certainty." *See,* Note, *The Requirement of Certainty in the Proof of Lost Profits*, 64 Harv. L. Rev. 317, 317 (1950). This "reasonable certainty" rule was formerly a rule of "absolute certainty,"[8] but this requirement has fallen into disuse. The absolute certainty requirement

---

[7] *See also* Illinois Pattern Jury instructions—Civil 700.02, 700.11 (2006).

[8] *See, e.g., Griffin v. Colver*, 16 N.Y. 489, 491 (1858) ("[D]amages to be recovered from a breach of contract [must] be shown with certainty, and not left to speculation or conjecture . . . .").

was reformed some time ago to the less demanding requirement of "reasonable certainty." *See* J. Mayne & H. McGregor, *Mayne & McGregor on Damages* § 174, at 163 (12th ed. 1961); *see also* C. McCormick, *Handbook on the Law of Damages* § 26, at 99-100 (1935) ("[T]he certainty rule in its most important aspect, is a standard requiring a reasonable degree of persuasiveness in the proof of the fact and the amount of damages. . . . [I]t appears that the epithet certainty is overstrong, and that the standard is a qualified one, of 'reasonable certainty' merely, or, in other words, of 'probability.'"). The Restatement (Second) of Contracts likewise expresses the requirement of proof of the precise amount of loss as one of "reasonable certainty." Restatement (Second) of Contracts § 352. Today, all United States jurisdictions enforce the requirement of "certainty" in damage award amount, but limit this requirement to "reasonable certainty."[9]

In Illinois, in order to recover for breach of contract, a plaintiff must establish both "that he sustained damages . . . [and] he must also establish a reasonable basis for computation of those damages." *Ellens v. Chicago Area Office Fed. Credit Union*, 576 N.E.2d 263, 267 (Ill. App. Ct. 1991). Dating back to the start of the 20th Century, Illinois courts have stated that, for lost profits to be an element of damages, they must be established with certainty, *see Trout Auto Livery Co. v. People's Gas Light & Coke Co.*, 1912 WL 1990, at *2 (Ill. App. Ct. 1912), capable of definite proof, *see Mugge v. Erkman*, 1911 WL 2315, at *2 (Ill. App. Ct.

---

[9]  *See* Bernadette J. Bollas, *The New Business Rule and the Denial of Lost Profits: Men Keep Their Promises When Neither Side Can Get Anything by the Breaking of Them*, 48 Ohio St. L.J. 855, 858 (1987).

1911), or capable of tangible proof, *see Favar v. Riverview Park*, 1908 WL 2065, at *2 (Ill. App. Ct. 1908).

The party claiming damage bears the burden of proving those damages to a reasonable degree of certainty. *See In re Estate of Halas*, 568 N.E.2d 170, 181 (Ill. App. Ct. 1991) (citing *Rosos Litho Supply Corp. v. Hansen*, 462 N.E.2d 566 (Ill. App. Ct. 1984) (abrogated on other grounds)). However, when a party establishes that it is entitled to damages but fails to prove the amount of those damages to a reasonable degree of certainty, only nominal damages are recoverable at the discretion of the trial judge. *Id.*

More recently, in the specific context of lost profits damages, Illinois courts have stated that "[l]ost profits will be allowed only if: their loss is proved with a reasonable degree of certainty; the court is satisfied that the wrongful act of the defendant caused the lost profits; and the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into." *Milex Prods., Inc. v. Alra Labs., Inc.*, 603 N.E.2d 1226, 1235 (Ill. App. Ct. 1992); *see also Royal's Reconditioning Corp. v. Royal*, 689 N.E.2d 237, 240 (Ill. App. Ct. 1997). When the profits arise out of a breached contract, those profits are considered an element of the contract and thus, within the contemplation of the parties at the time the contract was established; these damages are recoverable if proved to a reasonable degree of certainty. *Id.*

Certainly, because damages for lost profits are prospective, these damages will be inherently uncertain and incapable of calculation with mathematical precision. *Royal's Reconditioning*, 689 N.E.2d at 240. Nevertheless, the evidence presented must afford a reasonable basis for the computation of damages. *Id.* Indeed, the Supreme Court of Illinois has stated expressly that "the law does

not require that lost profits be proven with absolute certainty. Rather, the evidence need only afford a reasonable basis for the computation of damages which, with a reasonable degree of certainty, can be traced to defendant's wrongful conduct." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 199 (Ill. 2002) (citing *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61 (Ill. 1987)).

Illinois courts consistently have rejected "the use of speculative, inaccurate or false projections of income in the valuation of a business" and reviewing courts will reverse damage awards "based on speculation or conjecture." *SK Hand Tool Corp. v. Dresser Indus.*, 672 N.E.2d 341, 347, 348 (Ill. App. Ct. 1996). Moreover, the party requesting damages must show causation, that is that the alleged breach is the cause of those damages, with reasonable certainty. *Id.* at 348; *see also Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 66 (Ill. 1987).

Finally, as a general rule, expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery. *SK Hand Tool*, 672 N.E.2d at 348. This maxim is commonly referred to as the "new business rule" and, as we shall note later, the same approach applies likewise to new product lines in established businesses when profits are difficult to measure. There are, of course, some exceptions. *Milex Products v. Alra Laboratories, Inc.*, 603 N.E.2d 1226, 1236-37 (Ill. App. Ct. 1992), notes that there are circumstances in which the general rule that the lost profits of a new business are too speculative to be recoverable does not apply. The court in *Milex Products* relied upon cases in which experts have provided convincing and non-speculative evidence sufficient to prove lost profits, and where, as

such, the general rule that lost profits are not recoverable did not apply. *Id.*[10] Lost profits damages are difficult to recover in any case, and are allowed only if their loss is proved with "a reasonable degree of certainty." *Spangler v. Holthusen*, 378 N.E.2d 304, 309 (Ill. App. Ct. 1978). "A plaintiff generally must present competent proof of lost profits from which a reasonable basis of computation can be derived." *E.J. McKernan Co. v. Gregory*, 623 N.E.2d 981, 1000 (Ill. App. Ct. 1993) (citing *Nordhem v. Harry's Cafe, Inc.*, 529 N.E.2d 988 (Ill. App. Ct. 1988)).

Although many cases addressing damages for lost profits have included expert testimony, *see, e.g.*, *Milex Products*, 603 N.E.2d at 1236, Illinois law does not require expressly expert testimony to prove lost profits damages. Illinois courts likewise have highlighted that "mathematical certainty is not required" in the proof of lost profits. *Drs.*

---

[10] In *Milex Products v. Alra Laboratories, Inc.*, 603 N.E.2d 1226 (Ill. App. Ct. 1992), the court referenced three different cases in which the courts in fact award lost profits damages. First, in *Malatesta v. Leichter*, the profits of the person who operated a car dealership were held not too speculative to prove damages to a plaintiff who was prevented from acquiring the dealership. 542 N.E.2d 768 (Ill. App. Ct. 1989). This court held in *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986), that plaintiffs who had never owned a particular sports franchise could recoup lost profits based upon the profits made by the team owners. Finally, in *Rhodes v. Sigler*, 357 N.E.2d 846 (Ill. App. Ct. 1976), an Illinois appellate court held that the plaintiff could rely on evidence of the profit earned by the defendants; such evidence provided the requisite degree of certainty where the evidence showed that the plaintiff was no worse a farmer than the defendants.

*Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 491 N.E.2d 912, 917 (Ill. App. Ct. 1986).

With these principles in mind, we now turn to the question of whether TAS has shown that it has suffered damages through Cummins' alleged failure to market engines with TAS' technology. TAS attempts to demonstrate that it was damaged and to provide a reasonable basis for the calculation of these damages through two submissions. First, it presents evidence of the sales of TAS Products by Cummins' chief competitor, DDC. Second, it contends that Cummins should have achieved the sales estimates projected during negotiations. We shall examine each of these approaches in turn.

TAS submits first that it was damaged beyond the minimum royalty payments because Cummins' competitor, DDC, sold many more products than did Cummins. Relevant to this analysis is Illinois' "new business rule" which states that the reasonable certainty requirement for recovery of lost profits damages may be satisfied by comparable "past profits in an established business, but that the lost profits of a new business would be too speculative" on which to base recovery. *Malatesta v. Leichter*, 542 N.E.2d 768, 782 (Ill. App. Ct. 1989). The general rule under Illinois law is that a new business has no right to recover lost profits. *See, e.g., Stuart Park Assoc. Ltd. P'ship v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995) (interpreting Illinois law). Illinois courts have upheld damage awards based on comparable businesses where the "profits [are] of a person other than plaintiff, who operated the same established business at the identical location for the period of time which plaintiff seeks damages." *Id.* In situations where the plaintiff operated an established business at an identical location during the

same time period as a party for whom profit information is available, Illinois courts have held these comparisons to be "not of such a speculative nature to require a finding that plaintiff's lost profits may not be proved to a reasonable certainty." *Id.* The reasoning behind the rule is simply that a new business has not demonstrated yet what its profits will be. *See Milex Prods.*, 603 N.E.2d at 1236; *see also Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 908 (N.D. Ill. 2001).

We have recognized that Illinois' new business rule can apply when an entity, while established in the field, markets a new product. In *Stuart Park Associates Ltd. Partnership v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995), one party argued that its successes with other apartment complexes should dictate its likely profits regarding the disputed complex. However, we stated in that case that, because the complexes were different pieces of real estate from different markets, they did not provide a self-evident mode from which to generalize any lost profits incurred. *Stuart Park*, 51 F.3d at 1328.

Illinois courts likewise have held that the new business rule applies with equal force to new products which create potential new business for the entity. In *Milex Products,* an Illinois appellate court concluded that, in the context of the specific new product at issue, the plaintiffs had demonstrated the existence of an established market sufficient to prove damages. 603 N.E.2d at 1236. The court nonetheless acknowledged that, absent such special evidence, the new business rule would preclude recovery. *Id.* However, under the particular facts of the case, the court concluded that the proof of lost profits was based upon a reasonable degree of certainty. *Id.*

Other courts also have stated that past successes with similar products or businesses do not provide sufficient information from which to calculate lost profits on a new product or new business. *See Kinesoft*, 139 F. Supp. 2d at 909. In *Kinesoft Development Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 909 (N.D. Ill. 2001), the plaintiff Kinesoft relied on several exceptions to the new business rule in urging that this rule should not serve as a bar to recovery. First, Kinesoft urged that it had some profit record prior to the breach, which has been recognized as an exception to the new business rule under Illinois law. *Id.* Kinesoft also relied upon an exception recognized in *Milex Products* where an identical product had been sold by another company and thus, there was an established market from which to calculate lost profits. *Id.* at 910. However, the court found that Kinesoft had failed to present evidence regarding any comparable company selling comparable products. *Id.*

In this case, the Illinois "new business rule" provides significant guidance for our decision. It appears that Cummins manufactured two different products incorporating the TAS technology, a One-Box ECM ICON Product and a Two-Box Retrofit ICON Product. Each of these products incorporated both the Temp-A-Start and Temp-A-Stop technologies. Although DDC did manufacture and market TAS technology, it is undisputed, on this record, that only Cummins manufactured the ICON Product that incorporated both the Temp-A-Start and Temp-A-Stop technologies. Because a product containing both technologies is inherently different from one that contains only one type of TAS' proprietary technologies, the Illinois "new business rule" renders a comparison to DDC's sales of engines somewhat speculative, and, con-

sequently, counsels extreme caution in relying on this comparison as a measure of TAS' lost profits.

Moreover, Illinois law, even without reference to the new business rule, clearly requires that damages be proved to a reasonable certainty. *E.J. McKernan Co.*, 623 N.E.2d at 1000. TAS submits first that it was damaged beyond the minimum royalty payments because Cummins' competitor, DDC, sold many more products than did Cummins. TAS has failed, however, to produce any evidence that proves its lost profits to a reasonable certainty, and therefore TAS' claim must fail. We note that "Illinois courts have not hesitated to reverse damage awards based on false assumptions or data as speculative." *SK Hand Tool*, 672 N.E.2d at 348 (citing *Midland*, 515 N.E.2d at 67; *Reynolds v. Coleman*, 527 N.E.2d 897, 904-05 (Ill. App. Ct. 1988); *F.L. Walz, Inc. v. Hobart Corp.*, 510 N.E.2d 1248, 1252-53 (Ill. App. Ct. 1987)). Illinois courts also have stated that "[i]t is perhaps true that absolute certainty as to the amount of loss or damage in such cases involving lost profits is unattainable, but that is not required to justify a recovery. All the law requires is that it be approximated by competent proof." *Curt Bullock Builders, Inc. v. H.S.S. Dev., Inc.*, 634 N.E.2d 751, 753 (Ill. App. Ct. 1994) (internal citations and quotation marks omitted). The evidence before us on summary judgment simply does not establish a basis upon which damages can be calculated to a reasonable degree of certainty.

TAS submits that Cummins should have sold as many products incorporating the subject technology as did DDC. There is scant evidence in the record pertaining to the DDC's sales of engines with the TAS technology. Slepian, TAS' president, asserted in an affidavit that DDC

sold approximately 15,000 such engines per year.[11] TAS concedes that the exact number of units incorporating the TAS technology is a matter of proof for trial.[12] However, TAS must still face the principle that, to survive a motion for summary judgment on a breach of contract claim, the plaintiff must provide a basis upon which lost profits may be calculated to a reasonable certainty. *E.J. McKernan Co.*, 623 N.E.2d at 1000.

There is no evidence in the record, aside from TAS' assertions, suggesting that DDC's product sales provide a reasonable basis upon which to calculate damages. TAS submits that DDC is a chief competitor of Cummins, and, therefore, that DDC's sales numbers likewise should have been attained by Cummins. Merely stating that Cummins *should have* sold as many engines incorporating the TAS technology as did DDC, without more, does not warrant reversal of the district court's judgment. There is nothing in the record tending to suggest that Cummins could have sold as many products as DDC; the record is devoid of information relating to DDC's precise role in the engine market. The record also does not contain facts, beyond unsupported contentions, tending to establish that DDC and Cummins are sufficiently compara-

---

[11] Cummins also introduced a document before the district court suggesting that DDC sold only 4,883 units in 1991 and 6,516 units in 2002. R.36 at 12. We are obligated, on a motion for summary judgment, to view all facts in the light most favorable to the non-moving party. However, a factual dispute that exists as to the number of products sold by DDC does not affect our determination that DDC's product sales do not provide a reasonable basis for the computation of damages.

[12] Appellant's Br. at 41.

ble companies to warrant imputing DDC's engine sales to Cummins.

TAS also urges that Cummins should be bound by the sales projections it forwarded during negotiations. We believe that the district court properly noted that the Master Agreement's integration clause, Section 7,[13] precludes such an argument. The Supreme Court of Illinois has held expressly that, "where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999). The court went on to hold that, in a situation where the contract is facially unambiguous and contains an integration clause, the "four corners rule" applies, barring the consideration of extrinsic evidence. *Id.* at 886.

Therefore, Cummins' pre-contractual sales projections during negotiations cannot be considered proof of damages. TAS had that information when it established the minimum royalty payments, and has not shown that it was damaged in excess of those payments. The law is clear in Illinois that only the four corners of an integrated contract are properly considered when interpreting a contract. *See id.* Illinois courts have interpreted the parole evidence rule to bar the introduction of evidence relating to understandings not reflected in the terms of the contract,

---

[13] Section 7 of the Master Agreement states that "[t]his Agreement, the License Agreement, and the Consulting Agreement collectively shall constitute the entire agreement between TAS and Cummins and shall not be amended, modified, or rescinded in any part except by a writing signed by both parties."

reached either before or at the time of the contract's execution, where those terms would vary or modify the terms of the contract itself. *W.W. Vincent*, 814 N.E.2d at 966. Had TAS and Cummins intended the minimum royalty payments to set a minimum sales floor but in fact meant to require Cummins to pay significantly more than the amount outlined in the minimum royalty payment schedule, they were obligated, under Illinois law, to include this understanding within the four corners of the contract. Illinois law thus precludes us from considering any pre-contractual negotiations between Cummins and TAS in determining whether TAS has succeeded in proving it was damaged by Cummins' alleged failure to exercise all reasonable efforts.

TAS has failed to present, on this record, a reasonable basis for the calculation of any damages and likewise TAS has failed to show it was damaged beyond the minimum royalty payments paid by Cummins.

**B.**

Finally, TAS seeks specific performance of Cummins' obligations under the contract. Specific performance is an exceptional remedy and is normally available only when damages constitute an inadequate remedy. *See, e.g.*, *Miller v. LeSea Broad.*, 87 F.3d 224, 230 (7th Cir. 1996). Furthermore, an order for specific performance is appropriate only when the terms of the contract are sufficiently specific to allow the precise drafting of such an order. *See Crane v. Mulliken*, 408 N.E.2d 778, 780 (Ill. App. Ct. 1980); *see also* Restatement (Second) of Contracts § 362 ("Specific performance or an injunction will not be granted unless the terms of the contract are sufficiently certain to pro-

vide a basis for an appropriate order."). This court reviews the district court's denial of a request for specific performance for abuse of discretion only. *See, e.g.*, *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1403 (7th Cir. 1997).

TAS seeks an order mandating that Cummins shall perform specifically its obligation to make "all reasonable efforts" to manufacture and market the subject technology. Since TAS and Cummins have an ongoing relationship, and, in fact, TAS' prayer for specific performance expressly acknowledges the indefinite nature of the License Agreement, an order of specific performance would require the kind of ongoing supervision that strains judicial resources. *See, e.g.*, *New Park Forest Assoc. II v. Rogers Enters., Inc.*, 552 N.E.2d 1215, 1218 (Ill. App. Ct. 1990).

We cannot perceive any abuse of discretion in the district court's determination that specific performance was not an appropriate remedy. Again, specific performance is an extraordinary remedy and ought not be granted where the terms of the contract do not allow for the drafting of a precise order. Furthermore, specific performance is rarely an appropriate remedy where such a grant would mandate ongoing supervision by the court. We therefore cannot say that the district court abused its discretion in denying TAS' request for specific performance of the "all reasonable efforts" term of the License Agreement.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*