# In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-2953

ROBERTA CASTELLANO and MARION CASTELLANO,

*Plaintiffs-Appellants*,

v.

WAL-MART STORES, INCORPORATED,
a Delaware corporation,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 98 C 4149—**Philip M. Frazier**, *Magistrate Judge.*

———————

ARGUED FEBRUARY 20, 2004—DECIDED JUNE 24, 2004

———————

Before FLAUM, *Chief Judge*, and BAUER and MANION, *Circuit Judges*.

BAUER, *Circuit Judge*. Plaintiffs brought this action in the district court, charging breach of contract, invalidity of a lease amendment, breach of implied covenant of good faith and fair dealing, and two counts of fraud. The district court resolved all issues against the Plaintiffs through summary judgment and judgment as a matter of law. We review both summary judgment and judgment as a matter

of law de novo. *Juarez v. Menard, Inc.*, 366 F.3d 479, 481 (7th Cir. 2004); *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2002).

## I. BACKGROUND

In 1977 RJLC-1 Land Trust (RJLC) entered into a contract with Wal-Mart for the construction and lease of a commercial property in Marion, Illinois. RJLC then gave a mortgage to Republic Mortgage (Republic) and assigned the lease with Wal-Mart to Republic. Wal-Mart moved into the newly constructed retail space in 1979. Shortly thereafter, RJLC sold the property to Lancaster Trust and took back a second mortgage and assignment of rents.[1] Sometime later, RJLC ceased to exist and the mortgage and assignment it held ultimately went to Roberta Castellano, Marion Castellano's wife. A tornado struck the building in 1982 and caused substantial damage, particularly to the roof. Wal-Mart undertook the necessary repairs under the emergency provisions of the lease.

By 1985 Lancaster had sold the property to Alan Sagner, who, in turn, sold the property to Marion Partners (no relation to Plaintiff Marion Castellano). In 1985, Wal-Mart added to the building by constructing an addition on neighboring property and removing one wall of the leased premises to join the addition to the original building. Then, in 1987 Wal-Mart negotiated a third amended lease with Marion Partners.

By 1990 the roof had begun to leak and continued to do so for a number of years. On May 5, 1997, Wal-Mart sent a letter to Marion Partners which purported to terminate the

---

[1] Plaintiff-Appellant's brief states that Wal-Mart sold the building to Lancaster. This appears to be a mistake. The record and earlier federal opinions agree with the facts as recited above.

lease for Marion Partners' failure, or, more to the point, financial inability to fix the leaks. The lease was not terminated at that time. Marion Partners, however, had had enough and transferred the property to VistaCorp. Roberta Castellano then declared the mortgage she held in breach for wrongful transfer. VistaCorp ended up transferring the property to VP Land Trust—the legal beneficiary of which was J.D. Castellano, son of Roberta and Marion Castellano. Title was later transferred from VP Land Trust to Marion Castellano. Wal-Mart ultimately terminated the lease, moved out, and ceased paying rent.

When Wal-Mart moved out, the building was left in post-addition condition, i.e. it was missing one wall where it was attached to the adjoining property. Castellano sued for breach of contract, alleging that Wal-Mart had breached its duty to restore the common wall between the buildings.

In October 1998, a pair of letters were exchanged between the attorneys for Wal-Mart and Castellano. Castellano argued below that these letters constituted a partial settlement agreement wherein Wal-Mart would deed the building to Castellano in exchange for a release from the duty to restore the common wall. Castellano, after receiving the letter from Wal-Mart, began negotiations to sell the property to Rural King. Wal-Mart did not deliver the deed until April 6, 1999. This was after Castellano's attorney sent another letter to Wal-Mart's attorney, dated March 8, 1999, which memorialized an oral settlement agreement. The settlement agreement disposed of all outstanding issues except claims for roof repairs, past and future rents, removal of carpeting, and repair of tile. Castellano's third amended complaint included claims for breach of contract and fraud. The court disposed of the suit entering summary judgment in favor of Defendant on some of the claims and directing a verdict against the Plaintiffs on the remaining claims. Plaintiffs appeal.

## II.  DISCUSSION

*A.  Partial Settlement*

Castellano argues that the October 1998 letters constituted a binding settlement agreement that Wal-Mart fraudulently refused to honor because it knew that Castellano was in a dire financial situation. These financial woes led Castellano to enter into the March 1999 settlement agreement—a situation he says constitutes economic duress. Illinois law is clear that duress "does not exist merely where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances." *Cont'l Illinois Nat'l Bank and Trust Co. v. Stanley*, 606 F. Supp. 558, 562 (N.D. Ill. 1985). Furthermore, it is clear that Castellano had options— accept the March 1999 settlement offer or compel Wal-Mart to honor the October 1998 "agreement" by legal action. Castellano chose the former and accepted the benefits of the March 1999 settlement agreement. This is not duress. Moreover, entering into an agreement and *accepting the benefits of that agreement* ends the inquiry as to the validity of the settlement agreement. *Joyce v. Year Investments, Inc.*, 196 N.E.2d 24, 26-7 (Ill. App. 1964).

Since the March 1999 settlement agreement was binding and enforceable, then by its own terms, the only issues left in the case deal with "roof decking issues, roof repair issues, removal of carpeting from the tile floor, and rents due for the past and future, less any mitigation." This is true despite Plaintiffs' protestations to the contrary.

The Castellanos argue that the settlement letter's language stating, "the only remaining damage issues *in this case* . . ." is ambiguous. It is not. The very same letter refers to the case by docket number. By referring to the case's docket number, the agreement unambiguously refers to the *entire* case.

*B.   Validity of Third Amended Lease*

Plaintiffs argue that the third amended lease is invalid and unenforceable due to the fact that the lessor and lessee of the property did not get the written consent of the mortgagees before amending the lease, as required under the assignments of rents. We disagree.

*1.)   Validity of Third Amended Lease as it Relates to Plaintiff—Lessor Marion Castellano*

The facts show that Marion Partners, who originally executed the third amended lease, was a predecessor in interest to Marion Castellano. Being the successor in interest, Marion Castellano is bound by the terms of the third amended lease. *Sweeting v. Campbell*, 119 N.E.2d 237, 240 (Ill. 1954). For the sake of fairness, we note that there is nothing to indicate that Marion Castellano did not know of the third amended lease when he acquired the property. In fact, the lease was discussed in a case between J.D. Castellano, Marion and Roberta Castellano's son, and Marion Partners which was decided in 1990. *Castellano v. Marion Partners*, 1990 WL 357916, at *5-6 (S.D. Ill. 1990). It should also be noted that the original complaint and the first and second amended complaints named J.D. Castellano, as sole beneficiary of the V.P. Land Trust, as a Plaintiff. And, as Plaintiffs themselves note, "from an equitable standpoint, it would have been unjust for someone directly responsible for signing the document to now claim that the signature was ineffective." We agree. And since Marion Castellano is a successor in interest, he is, legally speaking, directly responsible for signing the third amended lease. *Sweeting*, 119 N.E.2d at 496-97.

### 2.) Validity of Third Amended Lease as it Relates to Plaintiff—Mortgagee Roberta Castellano

Plaintiffs assert that because the mortgagees did not consent to the third amended lease, it is unenforceable. This argument fails. As discussed above, J.D. Castellano knew of the third amended lease as far back as 1990. At that time, he was the holder of the wrap around mortgage.[2] *Castellano*, 1990 WL 357916, at *1, 3. J.D. Castellano and his successor in interest, Roberta Castellano, continued to accept the assigned rent payments with knowledge of the third amended lease. By knowingly accepting the benefits of the third amended lease for such a substantial period of years, the mortgagee acquiesced to the terms of that lease. *See Maher & Assocs v. Quality Cabinets*, 640 N.E.2d 1000, 1007 (Ill. App. 2d 1994) ("A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance."). Furthermore, it was stipulated in the Final Pretrial Order that Roberta Castellano did not have standing to assert a claim for breach of contract against Wal-Mart.

### C.   Termination of the Lease—Rents and Roof Repair

Plaintiffs' final colorable issues involve the question of whether Wal-Mart's termination of the lease constituted a breach and, relatedly, whether Wal-Mart was obligated to

---

[2] Black's Law Dictionary defines "wrap around mortgage" as follows: A second mortgage which wraps around or exists in addition to a first or other mortgages. Form of secondary financing typically used on older properties having first mortgages with low interest rates in which a lender assumes the developer's first mortgage obligation and also loans additional money, taking back from developer a junior mortgage in total amount at an intermediate interest rate.

return the building with a repaired roof. Since the third amended lease was valid and enforceable, we begin our inquiry there.

The third amended lease put the responsibility for roof maintenance on the lessor. The facts show that the roof had been leaking from as early as 1990 and continuing through 1997. Notice of the leaks was provided to the lessor over twenty-five times. In one instance, the fire department was dispatched to the store because the leaks had caused electrical short circuits. The leaks were not repaired and Wal-Mart terminated the lease by letter on May 5, 1997. The lease states, "[i]n the event of . . . the breach of any of the other agreements contained in Lease, this Lease shall terminate and be of no further effect at the discretion of the Lessee." The third amended lease put the duty of roof maintenance on the lessor. Wal-Mart was well within its contractual rights in terminating the lease for lessor's failure to maintain the roof.

As for the condition of the roof, there is no dispute that the building was almost totally destroyed by a tornado in 1982. Castellano was aware of this fact. The then-current lessor refused to repair the building and Wal-Mart completed the repairs under the emergency provision of the lease. These repairs benefitted the lessor as the lessee had no duty whatsoever to make those repairs. Both the original and the third amended lease make clear that the condition of the roof was solely the responsibility of the lessor. Plaintiffs attempt to put the duty to repair the roof on to Wal-Mart by pointing to a provision of the original lease which says "[e]xcept for the obligations of Lessor under paragraphs 8 and 9 of this lease, Lessee agrees, to maintain the interior of the demised premises and shall repair any damage caused by any act of, or by negligence of, the Lessee, its contractors, Licensees, agents, or Employees." They argue that this provision makes Wal-Mart responsible

for the condition of the roof because Wal-Mart hired the contractors to do the repairs after the 1982 tornado.

Paragraph 9 of the original lease puts the duty to maintain the roof on the lessor. It was due to the lessor's inaction that Wal-Mart made the roof repairs. As the repairs were the duty of the lessor, any repairs made by Wal-Mart under the emergency provision of the lease were done for the benefit of the lessor. The language of the original lease bears this out. It expressly excepts the obligations of the lessor from those duties assigned to the lessee; "[e]xcept for the obligations of Lessor under paragraphs 8 and 9 of this lease . . . ."

Finally, Plaintiffs attempt to argue that Wal-Mart committed fraud by installing a roofing system which did not match the original construction and/or concealing facts regarding the nature of the repairs. The district court dismissed these claims as being untimely. Plaintiffs did not address the issue of timeliness in their brief to this court. Without argument otherwise, we find no error in the district court's decision.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*