In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-1496, 08-1956 and 08-1971

GERHARD VON DER RUHR,
MARC VON DER RUHR, individuals,
and SEPTECH, INC., a Nevada Corporation,

*Plaintiffs-Appellants,*
*Cross-Appellees,*

*v.*


IMMTECH INTERNATIONAL, INC.,

*Defendant-Appellee,*

and

T. STEPHEN THOMPSON, GARY C. PARKS, et al.,

*Defendants-Appellees,*
*Cross-Appellants.*


Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 5335—**Robert W. Gettleman**, *Judge.*


ARGUED JANUARY 16, 2009—DECIDED JUNE 30, 2009

Before BAUER, FLAUM and WOOD, *Circuit Judges*.

BAUER, *Circuit Judge*.   Septech, Inc. sued Immtech, Inc. for breach of a licensing contract between the two companies. Septech's president, Gerhard Von der Ruhr, sued Immtech for breaching an option contract that he held to purchase Immtech stock. Von der Ruhr also sued three Immtech officers, T. Stephen Thompson, Gary C. Parks, and Rick L. Sorkin, for tortiously interfering with the option contract. In ruling on two motions in limine, after briefing and an evidentiary hearing, the district court prohibited Von der Ruhr from presenting lay opinion testimony about his expectation of Septech's profits from the licensing agreement and disallowed Septech's lost profits theory altogether because it lacked sufficient evidentiary support.

As to the stock options, the district court reserved judgment on defendants' motion for judgment as a matter of law; the jury found that Immtech breached the option contract with Von der Ruhr and that the individual officers tortiously interfered with the contract. The district court denied the defendants' renewed motion for judgment as a matter of law. Septech now appeals the district court's ruling on the motions in limine and the Immtech officers appeal the denial of their motion or renewed motion for judgment as a matter of law. Finding no error, we affirm.

## I. BACKGROUND

### A. The Sepsis Licensing Agreement

Gerhard Von der Ruhr founded several medical technology companies, including Immtech and Septech. Immtech developed and patented a pharmaceutical product called mCRP, a modified human protein, which Immtech hoped could treat the disease sepsis. Septech claims that through an assignment of rights from another of Von der Ruhr's companies, it received from Immtech an exclusive worldwide license for the mCRP patent, as well as the right to purchase mCRP from Immtech, and the right to the services of Dr. Potempa, Immtech's Chief Scientific Officer and the person who discovered the mCRP technology. Septech claims that after Von der Ruhr resigned from Immtech, Septech attempted to utilize the licensing agreement to purchase mCRP from Immtech in order to run clinical trials and that Immtech did not honor the agreement. Septech believes that if the agreement had not been breached, Septech would have further developed and realized great profits from this new drug. Whether Septech held rights to the original licensing agreement and whether Immtech breached that agreement are both disputed by the parties, but are not at issue here. Rather, this appeal focuses on whether Septech can prove lost profits damages if there was a breach.

Through Von der Ruhr's lay opinion testimony, Septech intended to establish that if Immtech had fulfilled its obligations, Septech would have entered into an agreement with a corporate partner, an undetermined major

pharmaceutical company, that would have been responsible for the details and costs of conducting the necessary clinical trials and walking the product through the FDA clearance process. Von der Ruhr was to testify that under the terms of the agreement that would have been negotiated, the corporate partner would be responsible for all elements and costs of manufacturing and marketing the drug and Septech would receive five percent of the drug's total sales. Von der Ruhr was to testify that, upon being introduced to the market, this new drug would have immediately captured, and for the next ten years would have maintained, at least half of the gross revenue of the only other drug to treat sepsis on the market at the time, an Eli Lilly product called Xigris. Finally, Septech intended for Von der Ruhr to testify that Septech's lost profits damages, discounted to their present value, totaled $42 million.

The district court did not allow this testimony and also precluded Septech's lost profits theory.


### B.  Von der Ruhr's Stock Options

Von der Ruhr held several options to purchase Immtech stock, one of which was an option for 56,000 shares at $.15 per share issued May 1, 1991 and to be exercised by May 1, 2001. After a series of stock splits and reverse stock splits, Immtech informed Von der Ruhr, and Immtech documents indicate, that the option was for 24,390 shares at $.34 per share. The option could be exercised in whole or in part.

Von der Ruhr attempted to exercise the option in April 2001. Together with a check, he sent a letter stating, "Enclosed please find a check for $8292.60 to exercise 24390 options." This comes out to $.34 per share. Upon receiving the request, Parks, Immtech's CFO, prepared a letter to Immtech's transfer agent instructing that the stock be issued. However, that letter was never sent. Instead it was marked, "Hold per TST [Thompson] & Sorkin." The officers claim that when they received Von der Ruhr's letter they consulted with Immtech's attorneys because Von der Ruhr had filed a separate lawsuit against Immtech a few days before they received the redemption request, regarding a different set of shares that Von der Ruhr claimed he had not received.

Parks informed Thompson and Sorkin that the correct price was not $.34 per share, but $.3409594 per share for a total of $8,316 and reported that Von der Ruhr's check was "technically . . . $23.40 short." Toward the end of June, Parks sent Von der Ruhr a letter, which Parks claims was drafted by legal counsel, stating that Von der Ruhr's request "fails to identify exactly which options you are intending to exercise" and asking him to clarify. Parks admitted at trial that he knew which options Von der Ruhr was trying to exercise. Parks' letter continued that if Von der Ruhr was intending to exercise the May 1, 1991 option, that the purchase price was $8,399.72.[1] Parks

---

[1] On appeal, the officers claim that the correct exercise price was $8,400, the original amount needed to exercise the 56,000

(continued...)

returned Von der Ruhr's check and the shares were never delivered. Von der Ruhr never responded to the request for clarification or sent another check, but that fact is, at this point, not important. The jury found that Immtech breached the option contract by not issuing the stock and no one appeals that issue. For the purposes of this appeal then, Von der Ruhr did everything necessary to exercise the option and was entitled to receive the shares.

The district court did not disturb the jury's verdict that this constituted a breach of the option contract and that the Immtech officers tortiously interfered with that contract.

## II.  DISCUSSION

On appeal, Septech argues that the district court erred by prohibiting Von der Ruhr's lay opinion testimony and Septech's lost profits theory. Immtech responds that it was proper to prohibit the testimony and theory because they lacked foundation. The Immtech officers cross-appeal, claiming that the district court erred by denying their motions for judgment as a matter of law, allowing them to be personally liable for the tortious interference claim. Von der Ruhr argues that he presented sufficient evidence to support the jury's verdict.

---

[1] (...continued)

shares, because the stock splits were all proportional adjustments that did not affect the substantive terms of the option.

"We review [the] district court's rulings on [the] motions in limine for an abuse of discretion" because "decisions regarding the admission and exclusion of evidence are peculiarly within the competence of the district court." *Heft v. Moore*, 351 F.3d 278, 283-84 (7th Cir. 2003) (internal quotations and citations omitted).[2] We review the district court's denial of the officers' motions for judgment as a matter of law de novo. *Castellano v. Wal-Mart Stores, Inc.*, 373 F.3d 817, 819 (7th Cir. 2004). Illinois law governs the substantive legal issues in this diversity action.

## A. Lay Opinion Testimony

Septech attempts a difficult task in this case: (1) to prove lost profits damages (2) in a complex market (3) from a product that has never been sold (4) without any expert testimony. And on appeal it is burdened with the additional weight of (5) proving that the district court's decision on this issue was an abuse of discretion. Septech argues that the district court improperly precluded Von der Ruhr's lay opinion testimony, which would have provided proof on several elements of its lost profits

---

[2] Septech argues that the district court improperly evaluated Von der Ruhr's proposed opinion by the standards for expert testimony and that we must evaluate this issue de novo. We see no evidence that the district court confused the two standards. The court's reasoning demonstrates that it was keenly aware of the distinction between the requirements for lay versus expert opinion testimony.

theory. Immtech responds that the district court was correct to prohibit the lay opinion testimony because it was not grounded in personal knowledge or experience.

Federal Rule of Evidence 701 dictates that lay

> testimony in the form of opinions or inferences [be] limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The last requirement is intended "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory comm. nn.

In the realm of lost profits, lay opinion testimony is allowed in limited circumstances where the witness bases his opinion on particularized knowledge he possesses due to his position within the company. *Id*. For example, the owner of an established business with a documented history of profits may testify to his expectation of continued or expanded profits when that opinion is based on his "knowledge and participation in the day-to-day affairs of [his] business." *Id*. (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)). This is allowed "only because that testimony is tied to [the witness'] personal knowledge . . . ." *Compania Administradora de Recuperacion de Activos Administradora de Fondos*

*de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 560 (7th Cir. 2008).

Von der Ruhr's proposed testimony does not fit these parameters. Rather, he intended to testify to his expectation of millions of dollars in profits from a brand new drug, which had not been approved by the FDA, which still needed a corporate partner, and for which no competitive market analysis had been conducted. It is difficult to imagine how anyone in this situation could possess the necessary personal knowledge to give a useful lay opinion based on his perception and it is clear that Von der Ruhr did not have such knowledge.

Von der Ruhr had no personal experience with obtaining a corporate licensing agreement for a pharmaceutical or treatment of any kind, had never brought a pharmaceutical to market, and had never made a profit from a pharmaceutical. Septech has utilized licensing agreements to commercialize two diagnostic tests, one to measure blood sugar and the other to test for residual alcohol. Because Von der Ruhr's position with Septech gives him a particularized knowledge about how Septech utilizes licensing agreements, he might have been permitted to explain how a licensing model is *designed* to work once a corporate partner is found. But Septech needed evidence that a corporate partner would have been found; the success of Septech's diagnostic tools did not give Von der Ruhr any insight into whether a major pharmaceutical company would have entered into a licensing agreement with Septech for this new sepsis drug.

When asked about his basis for believing that a major pharmaceutical company would have wanted to take

this new drug through the FDA clearance process, Von der Ruhr replied that the drug was safe, effective, and had a proven market. It is disputed as to whether the drug was known to be safe and effective, but even if it was, that did not give Von der Ruhr any personal experience with finding a corporate partner for a new pharmaceutical that had not been approved by the FDA. It may have been possible to find such a partner, but Von der Ruhr cannot testify to that out of his personal knowledge. Von der Ruhr was confident that: "You can talk to anybody in the pharmaceutical industry. They love to take technology that has advanced to that point, absolutely." Talking with someone from the pharmaceutical industry who was knowledgeable about this topic would have been useful, but was not offered. Instead, the district court was required to decide whether it should allow Von der Ruhr to tell the jury how he believed the pharmaceutical industry would have responded to the opportunity to spearhead Septech's new product.

Von der Ruhr also claimed to have "talked to a number of investment bankers who have very good contacts to the pharmaceutical industry who have always emphasized 'bring me a product that we can take to clinical trials, and we'll establish a relationship.' " He claimed to have talked with one prominent financial figure who is well known in the pharmaceutical industry who told him "that if you have a product that has shown safety and efficacy, there will be enough corporate, potential corporate partners who would love to partner with you . . . ." Again, this does not demonstrate personal knowledge of the pharmaceutical industry or how it would have re-

sponded to an offer to form a licensing agreement with Septech to bring this new drug to market. Nor was Von der Ruhr qualified to testify to how investment bankers would have responded to the prospect of this new pharmaceutical—especially when Von der Ruhr never claimed to have had any conversations about *this* product.

Again, Von der Ruhr did not have any particularized knowledge of the market for a sepsis treatment or the competition in that market. Septech claims that:

> Septech already commercialized to [sic] tests and have [sic] realized profits—through a licensing agreement. Again, this is Mr. Von der Ruhr's special, particularized and intimate knowledge of his company licensing products to corporate partners for a profit. Therefore, it is undeniable that Mr. Von der Ruhr had personal and relevant knowledge regarding the sepsis market and his competition, understood the viability of the sepsis technology and had well-founded expectations about the potential profits it could generate.

We see no connection between Septech's successful development of two diagnostic tests and Von der Ruhr's personal knowledge of a completely independent market.

Furthermore, to support this claim of Von der Ruhr's personal knowledge of the sepsis market, Septech cites only to a series of materials that Von der Ruhr read. While experts are allowed to give testimony based outside of their personal experience or observation, lay witnesses are not. In *Lightning Lube*, 4 F.3d at 1175, the business owner was permitted to rely in part on a report he

created with the assistance of an accountant in determining his damages calculation. But his testimony was also based on his "knowledge and participation in the day-to-day affairs of his business," which had actually realized profits. *Id.* at 1174-75. The Third Circuit affirmed the district court's conclusion that "in preparing a damages report the author may incorporate documents that were prepared by others, while still possessing the requisite personal knowledge or foundation to render his lay opinion admissible under Fed. R. Evid. 701." *Id.* at 1175 (quoting 802 F. Supp. 1180, 1193 (D.N.J. 1992)).

In this case, Von der Ruhr had no first hand knowledge of the sepsis market and would have relied entirely on information he had been told or had read. "This is the kind of testimony traditionally provided by an expert: '[I]t could have been offered by any individual with specialized knowledge of the [sepsis] market.' " *Compania*, 533 F.3d at 560 (quoting *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002)). Von der Ruhr did not have any personal knowledge or experience to contribute.

Von der Ruhr also lacked sufficient personal knowledge to testify that Septech's new drug would have captured fifty percent of the gross revenues of Xigris and maintained that market share for the ten-year life of the patent. The level of speculation this testimony requires is demonstrated by the fact that Von der Ruhr's damages calculation projects capturing fifty percent of the gross sales of Xigris with no regard to the percentage of prescribed sepsis treatment doses Septech's drug would capture. Von der Ruhr believed that one dose of Xigris cost the patient

more than $10,000, but did not care what a dose of Septech's drug would have cost. The following exchange took place at the evidentiary hearing:

> Q. Do you have any personal knowledge of what it would cost a patient for a single dosage of mCRP?
>
> A. That would have been a question for the corporate partner. They set the price.
>
> Q. So you don't know?
>
> A. Well, that is immaterial. The corporate partner would set the retail price. We wouldn't. We would get a 5 percent royalty fee.

It is difficult to understand how Von der Ruhr was qualified to opine that Septech's corporate partner would have sold at least $100 million worth (half of Xigris' sales) of this new drug each year without knowing or even caring how many doses would have been administered and at what cost per dose.

When asked for the basis of his fifty percent figure, Von der Ruhr gave a concise, but unsatisfying answer: "Two reasons, number one, the market has incredible potential. Eli Lily [sic] has just scratched the surface. And, number two, I believe that mCRP is a better product." Von der Ruhr never claimed to have conducted a real market analysis for Septech's new drug. The basis for his belief that Septech had developed a better product than Xigris is unclear, especially when Von der Ruhr admitted that he did not know the patient requirements for prescribing Xigris, the contraindicatations for prescribing Xigris, or the side effects of Xigris (though he did remember

reading an article in the New England Journal of Medicine about side effects). Neither did Von der Ruhr explain how doctors or consumers would have immediately recognized that Septech's product was better than Xigris. But most importantly, even if Von der Ruhr could have further defended his beliefs, it would not have been through his personal knowledge or perception. Instead of qualifying experts or conducting a true market analysis, Septech offered Von der Ruhr's testimony for the proposition that if there is a $200 million per year market that is shared by two companies and one company has a "better product," that company will generate at least $100 million per year.[3]

Finally, Von der Ruhr demonstrated at the evidentiary hearing that he had no knowledge, personal or specialized, as to what other potential sepsis treatments were in the developmental pipeline, or how their introduction might affect the sepsis treatment market. Neither did his analysis consider how Eli Lilly might have responded to the introduction of Septech's drug.

None of the cases Septech cites to in its brief help its cause. In *Compania*, 533 F.3d at 560-61, the lay witness was not permitted to present a valuation estimate even though he had extensive experience in the industry

---

[3] We do not suggest, nor did the district court find, that experts are required to prove lost profits damages, *see TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625, 634 (7th Cir. 2007); we merely observe that Von der Ruhr was not the appropriate agent to introduce this evidence.

because the proposed testimony was not based on his relationship with the particular goods in question. The business owner in *Lightening Lube*, 4 F.3d at 1174-75, had realized actual profits from that business in the relevant industry, giving him a basis for his expectation of continued and expanded profits. In *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1216-23 (11th Cir. 2003), the lay witnesses were involved in the details of repairing the ship in dispute and based their testimony on "particularized knowledge garnered from years of experience within the field." In *In re LTV Steel Co.*, 285 B.R. 259, 264 (Bankr. N.D. Ohio 2002), it was undisputed that the proposed testimony was "rationally based on the perception of the witness" according to Rule 701. Finally, the rule in *R.I. Spiece Sales Co. v. Bank One, N.A.*, No. 1:03-CV-175-TS, 2005 WL 3005484 (N.D. Ind. Nov. 9, 2005), goes against permitting Von der Ruhr's testimony. In that case, the court stated that a lay witness with "special knowledge of the business and its operations may also testify as to the facts of the business that underlie profit expectations" but "may not make inferences from the data . . . ." *Id*. at *1. The court allowed a business owner to calculate his lost profits based on "actual past performance." *Id*. at *2. Furthermore, *Lighting Lube* and *Tampa Bay* presented an opposite procedural position from this case because the appellate courts were reviewing the district courts' decisions to *allow* the testimony for an abuse of discretion. Here we review the district court's decision to *preclude* the testimony for an abuse of discretion.

We find no such abuse.

### B.  Lost Profits Damages

After Von der Ruhr's lay opinion testimony is rejected as improper, Septech has no one to testify, among other things, that it would have obtained a corporate partner, what the terms of the corporate licensing agreement would have been, or how much of the market this new drug would have captured and maintained. Therefore, it cannot prove its entitlement to lost profits damages. Septech admits as much, explaining that "the court excluded the testimony of Mr. Von Ruhr [sic] and consequentially the lost profit calculation of Septech, Inc." Because Septech's lost profits theory depended on Von der Ruhr's testimony, we need not discuss Illinois' new business rule, *TAS Distributing*, 491 F.3d at 633-34, or the requirement that a plaintiff establish lost profits with "reasonable certainty," *id.* at 631, either of which would have likely precluded Septech's lost profits theory.

### C.  Tortious Interference with Contract

Thompson, Parks, and Sorkin argue that there was insufficient evidence for the jury to find against them personally and that the district court should have granted their motion or renewed motion for judgment as a matter of law. Von der Ruhr argues that the jury heard sufficient evidence to justify its verdict. We review a denial of a motion for judgment as a matter of law de novo, "examining the record as a whole to determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, was sufficient to support the jury's verdict." *Walker v. Bd. of Regents of*

*the Univ. of Wis. System*, 410 F.3d 387, 393 (7th Cir. 2005) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1173 (7th Cir. 2002)). In making this determination, we are mindful of the fact that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Therefore, we "must disregard all evidence favorable to the [officers] that the jury [was] not required to believe." *Reeves*, 530 U.S. at 151. The jury's verdict must stand unless the officers "can show that 'no rational jury could have brought in a verdict against [them].'" *Woodward v. Correctional Medical Services of Ill., Inc.*, 368 F.3d 917, 926 (7th Cir. 2004) (quoting *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 745 (7th Cir. 1994)).

There is no dispute that the option contract was breached. Neither are the elements of tortious interference at issue. The only issue on appeal is whether it was proper to allow the jury to impose personal liability on Thompson, Parks, and Sorkin. Corporate officers normally enjoy protection from personal liability for acts they commit on behalf of the corporation. *See George A. Fuller Co. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1333 (7th Cir. 1983) (discussing Illinois law). To get around this qualified privilege in a tortious interference claim in Illinois, a plaintiff must "establish that the officers induced the breach to further their personal goals or to injure the other party to the contract, *and* acted contrary to the best interest of the corporation." *George A. Fuller Co.*, 719 F.2d at 1333 (citations omitted).

Parks sent Von der Ruhr a letter in 1999 stating that the price per share for his options after the stock splits was $.34. Immtech documents from December 1998 and October 2000 also indicate that the proper price was $.34 per share.[4] Additionally, another major Immtech shareholder, Dr. Anderson, held the same stock option and was able to exercise it at $.34 per share. Yet when Von der Ruhr tried to exercise his options at $.34 per share—a price Immtech told him was proper—his efforts were hindered and he was given a new price. This sudden acute sensitivity to detail when Von der Ruhr tried to exercise his options could have caused the jury to believe that the officers were interested in harassing Von der Ruhr.

Parks obviously believed that Von der Ruhr validly exercised his options because, upon receiving Von der Ruhr's request, he quickly drafted a letter to Immtech's transfer agent authorizing the release of the shares. Yet Thompson and Sorkin somehow instructed that the letter should not be sent and it was marked "Hold per TST & Sorkin." The jury could have found these actions suspicious.

The jury also could have found it troubling that, although Parks admitted at trial that he knew which

---

[4] Parks did send Von der Ruhr a letter in March of 2000 stating that the total strike price of the option was $8,316, but it did not specify a price per share. Furthermore, this evidence does not preclude the jury from finding against the officers; the jury was not required to be persuaded by one document over another.

options Von der Ruhr was attempting to exercise, Parks sent Von der Ruhr a letter stating that Von der Ruhr failed "to identify exactly which options [he was] intending to exercise." The jury could have found it foolish and contrary to Immtech's best interest to risk breaching a contract with Von der Ruhr because, as Parks reported to Thompson and Sorkin, "[t]echnically, he is $23.40 short." Finding that the officers needlessly breached the option contract over $23.40, the jury could have believed that the officers acted for vindictive reasons.

The jury's concern that the officers were motivated by a desire to injure Von der Ruhr might have been heightened by the fact that the options could have been exercised in whole or in part. Thompson testified that it would not have been appropriate to issue only some of the shares because Von der Ruhr's letter indicated that he wanted a certain number of shares for a certain amount of money and his figures did not align. Of course, the jury could have found that the figures did align because the options should have been honored at $.34 per share. Or the jury could have concluded that if personal animus was not involved, the officers would have at least delivered the number of shares to which they believed Von der Ruhr was entitled, since Parks knew which set of options Von der Ruhr was attempting to exercise.

The jury also knew about the history between Von der Ruhr and Immtech. Von der Ruhr founded Immtech, but resigned as a board member and Chairman a few years before this attempt to exercise his options because he

disapproved of certain steps the company was taking to prepare for an initial public offering. Von der Ruhr told Thompson that he doubted the wisdom of some of Immtech's financing decisions and expressed concern that the financing was moving too slowly. Von der Ruhr informed Thompson that he was resigning because, as he mentioned on several occasions, he opposed requiring certain shareholders to sign lock-up agreements, preventing them from selling their stock for a period of time after the IPO.

Von der Ruhr's refusal to sign the lock-up agreement prompted Sorkin to write a letter to Thompson in March of 1999 "demanding Immtech to rescind all of Mr. Von der Ruhr's options and warrants for cause." Also related to the contentious lock-up agreement, Parks wrote a letter to Sorkin in October of 2000 documenting Von der Ruhr's shares and outstanding options, in which Parks stated about the document: "Frankly it takes a lot of the wind out of Gerhard's sails."

Von der Ruhr and Immtech were in active conflict over a different set of stock options at the time Von der Ruhr attempted to exercise the options at issue in this case. Von der Ruhr filed a lawsuit against Immtech a few days before it received his request to exercise the current set of options. Also around the time that Von der Ruhr attempted to exercise the shares at issue in this case, he complained to Thompson about Immtech's tax treatment of some of Von der Ruhr's prior options. The trial exhibits thoroughly document a history of tension and disagreement between Von der Ruhr and Sorkin, Parks, and

Thompson. The jury was entitled to consider the officers' actions in light of the broader context of the uncomfortable relationship between Von der Ruhr and the Immtech officers.

The officers claim that they simply acted according to advice from Immtech's attorneys, but following the advice of an attorney is not an absolute shield from liability. Furthermore, no attorneys testified or were named at trial; the jury was free to disbelieve the officers' claim that they relied on attorneys. For example, Parks' letter to the transfer agent was marked, "Hold per TST & Sorkin." It did not mention any advice of counsel. The report Parks prepared for Thompson and also sent to Sorkin notifying them of the recalculated price per share, stated about the disputed option: "I am holding per your instructions." Again, this gives no indication that the officers were acting on the advice of their attorneys. Alternatively, if the officers did solicit advice from counsel, that advice was of questionable value because it resulted in a breach of contract. The jury could have found that the officers would not have followed such advice if they were not motivated by disdain for Von der Ruhr.

The officers point to other evidence that supports their assertion that they acted innocently and that they were necessarily proceeding deliberately and cautiously because of the history between Von der Ruhr and Immtech. Certainly there is evidence that supports this conclusion and it may be true. But that is not our decision to make. The law requires that we simply ask whether

there was sufficient evidence presented to support the jury's verdict. *Walker*, 410 F.3d at 393. There was. The jury's verdict was not irrational and we will not disturb it. *See Woodward*, 368 F.3d at 926.

### III. CONCLUSION

For the reasons discussed above, we AFFIRM the rulings of the district court.